IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARY MORENO LONGORIA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. H-04-2615 |
| | § | |
| KELLY SERVICES, INC. d/b/a | § | |
| KELLY ENGINEERING | § | |
| SERVICES, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Pending before the Court is Defendant Kelly Services, Inc.'s Motion for

Summary Judgment (Document No. 22). Having considered the motions, submissions,

and applicable law, the Court determines the motion should be granted.

## BACKGROUND

Mary Moreno Longoria ("Longoria") began working for Kelly Services, Inc.

("Kelly"), a national staffing company, as a temporary employee in 1998. By May

2000, Longoria was working as a full-time Technical Recruiter for Kelly at a Houston

branch office. Longoria's job entailed locating and placing qualified candidates in

vacant engineering positions with Kelly customers.

In April 2002, Longoria completed sexual harassment training, a mandatory

course required of all Kelly employees. Upon completing the course, Longoria signed

a verification form indicating she understood Kelly's sexual harassment policy and how to report suspected violations.  Kelly retained this form in Longoria's file.

In March 2003, Chris Shumard ("Shumard") was hired as a Sales Manager at the Houston branch office where Longoria worked.[1]  Shumard occupied the cubicle next to Longoria.  On July 10, 2003, Longoria sent an e-mail[2] to Randall Smith ("Smith")[3] and Bill Clark ("Clark"),[4] indicating that "it ha[d] become very difficult to work with [Shumard]" because Longoria perceived that Shumard refused to follow Kelly operating procedures.  Furthermore, Longoria reported that Shumard eavesdropped on her telephone calls and offered her unsolicited business advice.  In this e-mail, Longoria requested that Kelly management move either Shumard or her to another work area.  Longoria's e-mail was silent regarding any work-related incidents involving inappropriate sexual comments or conduct.

Seven minutes later, Smith responded to Longoria's e-mail and reassured her that her complaints were "heard and understood."  Smith stated Longoria's concerns "[would] be addressed" in an "open and frank" team discussion with Shumard and

---

[1]Kelly hired Shumard because of his experience and record in the recruiting industry. Shumard was not Longoria's supervisor, but Longoria recruited for Shumard's clients.

[2]Longoria entitled the e-mail "Confidential."

[3]Smith was Longoria's supervisor and Kelly's Branch Manager.

[4]Clark was the Regional Director at the Kelly branch where Longoria worked.

other co-workers the next day.  Longoria e-mailed Smith back and insisted that her complaints about Shumard be handled confidentially.  Smith met with Shumard and developed a "Job Requisition Flow," which outlined both Shumard's and Longoria's job responsibilities and appropriate recruiting procedures.

Later in July 2003, Longoria went to Smith's office and again complained that Shumard was not following Kelly operating procedures.  During this meeting, Longoria first informed Smith that Shumard had directed sexually-oriented comments toward her.[5]  Longoria asserted (1) Shumard and another Kelly employee, Chuck McCarthy ("McCarthy"), often asked female co-workers whether certain female clients were "hot;" (2) Shumard and McCarthy had a conversation with a co-worker about a date she had been on; and (3) Shumard asked Longoria if she had ever left a man because his penis size was inadequate.[6]

At this point, the parties' factual accounts diverge regarding Smith's corrective action.  Smith's declaration states he privately met with Shumard regarding Longoria's complaints.  Although Shumard denied making the sexual comments, Smith notified Shumard that future similar acts would not be tolerated and would result in disciplinary

---

[5]Longoria documented these incidents on July 15, 2003.  Although not positive, Longoria thinks Shumard began making these comments around July 2003.

[6]Some inconsistency exists regarding this statement.  In her deposition, Longoria contends Shumard asked her whether she had ever "dated" a man because of his penis size.

action.  Smith declares he received no further complaints from Longoria after warning Shumard that such behavior was unacceptable.  However, in Longoria's October 2003 complaint to the Texas Commission On Human Rights ("TCHR"), she contends Smith took no corrective action upon learning of Shumard's behavior.  In contrast, Longoria sent an e-mail to Elsa Verrier ("Verrier")[7] on September 17, 2003, referring to a private meeting between Smith and Shumard.  At her May 19, 2005 deposition, Longoria testified she was unsure whether Smith addressed her complaints with Shumard, but conceded Smith seemed "attentive" to her concerns.  Moreover, according to her deposition, Longoria could not remember whether Shumard made further sexually oriented comments after her initial complaint in mid-July.

Despite the apparent resolution, Longoria contacted Verrier in Human Resources on September 17, 2003.  Longoria repeated her allegations that Shumard failed to abide by Kelly operating procedures and behaved inappropriately.  In addition to the three statements she previously reported to Smith, Longoria asserted that Shumard (1) once asked Longoria if her nipples had gotten bigger after she breast-fed her child,[8] and (2) once told Longoria that a female customer preferred to speak with him because he had

---

[7]Verrier is a Human Resources Generalist with Kelly.

[8]The actual context of this comment varies from document to document.  Longoria says "cracked" in her affidavit, "hardened" in her deposition, and "bigger" both in an e-mail to Kelly Human Resources and in the complaint to the TCHR.

"mojo."[9]

On September 22, 2003, Verrier began her investigation of Longoria's complaint and discovered Shumard made the comments Longoria reported. However, Longoria admitted to Verrier that she "tun[ed] [Shumard and McCarthy] out while she was working." On September 26, 2003, Clark, Smith, and Verrier discussed the matter with Shumard and gave him a final written warning outlining immediate areas of needed improvement. Kelly management advised Shumard that further inappropriate comments would result in his immediate termination. Furthermore, Kelly required Shumard to complete sexual harassment training within a two-week period.[10] During this meeting, Smith instructed Shumard that Longoria would no longer recruit clients for him. Longoria made no further complaints about Shumard.

On October 1, 2003, Clark, Smith, and Verrier privately met with Longoria to discuss her job performance. Kelly contends Longoria's job performance was a serious issue beginning in early Spring 2003, but maintains the meeting was not disciplinary. Longoria received no written warning or reprimand. Rather, Clark, Smith, and Verrier suggested ways Longoria could improve her client fill rate. Longoria interpreted the meeting as employer retaliation on Kelly's behalf in response to the complaints

---

[9]Longoria believes "mojo" is a synonym for "penis."

[10]Shumard completed the sexual harassment training on October 6, 2003.

Longoria had lodged against Shumard.

Subsequently, Longoria filed a charge of discrimination based on sex and retaliation with the TCHR on October 15, 2003.[11]  Following the October meeting, Longoria's job performance improved significantly.  In 2004, Longoria was Kelly's top large branch recruiter for two consecutive quarters.  Moreover, Longoria continued to thrive with Kelly until her voluntarily resignation on May 13, 2005.[12]

On May 2, 2004, Longoria timely filed the instant action against Kelly in the 215th Judicial District Court in Harris County, Texas.  Longoria's petition asserted the following claims against Kelly:  (1) sexual harassment, in violation of the Texas Commission on Human Rights Act ("TCHRA"); (2) retaliation, in violation of the TCHRA; (3) intentional infliction of emotional distress; and (4) negligent hiring, retention, and supervision.  Kelly removed the action to federal court on July 6, 2004 and filed its motion for summary judgment on June 13, 2005.[13]

STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R.

---

[11]The Equal Employment Opportunity Commission ("EEOC") issued Longoria a right-to-sue letter on October 14, 2004.

[12]Longoria accepted a similar position with Addecco, one of Kelly's competitors.

[13]Kelly removed the instant action pursuant to diversity jurisdiction.

CIV. P. 56(c).  The court must view the evidence in a light most favorable to the non-movant.  *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).  Initially, the movant bears the burden of presenting the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-movant to come "forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting FED. R. CIV. P. 56(e)).

A fact is "material" if its resolution is outcome determinative.  *Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528, 531 (5th Cir. 1994).  "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).  The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conclusory allegations unsupported by specific facts will not prevent an award of summary judgment; the plaintiff cannot rest on his allegations to get to a jury without any significant probative evidence tending to support the complaint. *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 713 (5th Cir. 1994).

Thus, the non-movant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998).  It is not the function of the court to search the record on the non-movant's behalf for evidence which may raise a fact issue. *Topalian v. Ehrman*, 954 F.2d 1125, 1137 n.30 (5th Cir. 1992).

## LAW AND ANALYSIS

I.    Texas Commission on Human Rights Act Claims

_____The EEOC and TCHR cooperate together under a "Worksharing Agreement," and each agency shares the responsibility of processing complaints. *Vielma v. Eureka Co.*, 218 F.3d 458, 462 (5th Cir. 2000).  Consequently, when a complainant files a charge with the TCHR, the charge is also considered filed with the EEOC. *Id*. at 462-63.  To bring an employment discrimination violation under Chapter 21 of the Texas Labor Code, also known as the Texas Commission on Human Rights Act, the Texas Supreme Court has held exhaustion of the administrative remedies outlined in the Act is a mandatory prerequisite. *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex. 1991).  Based on the record, the Court determines Longoria appropriately exhausted her administrative remedies

A.    *Sexual Harassment*

Longoria claims Kelly subjected her to a hostile work environment because she was sexually harassed by a co-worker in the course of employment. To succeed on a claim of sexual harassment in the workplace, Longoria must satisfy five elements: (1) she belongs to a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition or privilege of employment;" and (5) the employer either knew or should have known of the harassment and failed to take prompt remedial action. *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th Cir. 1993). Here, Kelly concedes Longoria established the first three elements. Consequently, the Court addresses elements four and five.

1. *Whether the Harassment Affected a Term, Condition, or Privilege of Employment*

Kelly first contends the alleged conduct is simply not sufficiently severe and pervasive enough to create an abusive work environment. To establish the sexual harassment affected a "term, condition or privilege" of her employment, Longoria must show the discriminatory conduct was severe or pervasive enough to create an objectively hostile or abusive working environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). While no single factor is determinative, the Court examines all of the relevant circumstances, including: (1) how frequently Shumard harassed Longoria; (2) the severity of the harassment; (3) whether Shumard's conduct

was physically threatening or humiliating rather than merely an offensive utterance;[14]

(4) whether the harassment unreasonably interfered with Longoria's work performance;

and (5) whether Shumard's conduct undermined Longoria's workplace competence.

*Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 269 (5th Cir. 1998).  Before analyzing

the instant action, the Court contrasts two workplace sexual harassment cases to

illustrate how severe or pervasive the harassment must be to survive summary

judgment.  *Shepherd v. Comptroller of Pub. Accounts of Tex.*, 168 F.3d 871(5th Cir.

1999); *Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir. 1989).

     In *Shepherd v. Comptroller of Public Accounts*, Shepherd's co-worker, Moore,

told her, "[Y]our elbows are the same color as your nipples."  *Shepherd*, 168 F.3d at

872.  Then, Moore told Shepherd she had large thighs and feigned peering up her skirt.

*Id*.  More than once, Moore touched Shepherd's arm and "rubb[ed] one of his hands

from her shoulder down to her wrist while standing beside her."  *Id*.  At other times,

Moore would stand over Shepherd while she worked at her desk and try to look down

her blouse.  *Id*.  Shepherd was tardy to an office meeting twice, and both times "Moore

patted his lap and remarked 'here's your seat.'"  *Id*.  Despite such "boorish and

offensive" conduct, the Fifth Circuit held Moore's comments were "the equivalent of

a mere utterance of an epithet that engender[s] offensive feelings."  *Id*. at 874.  Thus,

---

[14]Longoria concedes in her deposition that Shumard never physically touched her.

10

Shepherd's allegations were insufficient to survive summary judgment. *Id.*

By comparison, the severe and persistent harassment in *Waltman v. International Paper Company* raised a fact issue regarding the existence of a hostile or abusive work environment. *Waltman*, 875 F.2d at 477-78. For instance, one of Waltman's co-workers repeatedly aimed obscenities at Waltman over the company's public address system. *Id.* at 470. Consequently, the incident encouraged other employees to barrage Waltman with inappropriate remarks. *Id.* at 470-71. Waltman's supervisor encouraged her to have sex with another employee. *Id.* at 471. Moreover, the supervisor often "pinched her buttocks with pliers and tried to put his hands in [Waltman's] back pockets." *Id.* During a three-year span, Waltman's co-workers placed over thirty pornographic notes in her locker. *Id.* One co-worker threatened to "cut off [Waltman's] breast and shove it down her throat." *Id.* He later "dangled Waltman over a stairwell, more than thirty feet from the floor." *Id.* More than half of Waltman's male co-workers directed sexual comments at her, and the harassment occurred on a weekly basis. *Id.* Accordingly, such facts entitled Waltman to relief.

Here, Longoria claims that Shumard harassed her in the following ways: (1) he once inquired whether Longoria had ever left a man because of his penis size; (2) he once asked Longoria if breast-feeding had altered her nipples; (3) he once told Longoria that female clients responded better to him because he had "mojo;" (4) he

occasionally asked Longoria if certain women had "hot bods;"[15] and (5) Longoria once overheard Shumard ask a female employee about her date.  Longoria states the harassment began in July, but does not recall any incidents after she reported Shumard's conduct to Smith in mid-July.  Other than repeated inquiries about "hot bods," Shumard only made four inappropriate comments.  Compared to the weekly harassment spanning three years in *Waltman*, the Court determines the conduct here is too infrequent to be severe and pervasive enough justify relief.

The United States Supreme Court has held that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher v City of Boca Raton*, 524 U.S. 775, 788 (1998).  Shumard's offhand inquiries regarding genitalia, nipples, and the purported "hot bods" of other women are certainly "boorish and offensive," if not juvenile and shallow.  However, these isolated incidents are not severe given the appalling facts of *Waltman*, and,  compared to the harassment in *Shepherd*, Longoria's allegations are inferior.

Shumard's isolated comment about Longoria lacking "mojo" amounts to "simple teasing" considering the popular meaning of the word and the context in which it was

---

[15]Longoria does not remember how often Shumard asked whether women were "hot," but she asserts it occurred "often."

used.[16]  Finally, Shumard's conversation regarding a female co-worker's date fails to create a hostile or abusive working environment because Longoria neglects to relay how this discussion was offensive.  Moreover, inquiring how a co-worker fared on a recent date equates to typical, friendly office banter.

Additionally, Shumard's conduct failed to unreasonably interfere with Longoria's job performance.  First, Longoria's disclosure that she "tuned out" and "didn't pay much attention" to Shumard's antics indicates she was able to effectively perform her work.  Although Longoria asserts Kelly management never questioned her job performance until October 2003, Smith contends Longoria's fill rate was lagging before Kelly hired Shumard.  Regardless, both parties agree that Longoria's fill rate improved following Shumard's alleged harassment and the October 1 performance meeting as Longoria became Kelly's top large branch recruiter for two consecutive quarters.  In summary, Shumard's conduct was infrequent and not severe or physically threatening.  Therefore, the Court determines Longoria cannot establish the fourth prong because the sexual harassment at Kelly was not severe or pervasive enough to affect the terms, conditions, or privileges of Longoria's employment.

---

[16]Originating in Africa, "mojo" connotes "magic" or "witchcraft."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1454 (1986).  "Mojo" was widely popularized by the movie character, Austin Powers, International Man of Mystery.  AUSTIN POWERS: THE SPY WHO SHAGGED ME (New Line Productions 1999).

2.    *Whether Kelly Failed to Take Prompt Remedial Action*

Despite failure to establish the fourth prong, the Court examines whether Kelly failed to take prompt remedial action.  Longoria must prove Kelly failed to take "prompt remedial action" that was "reasonably calculated" to end the harassment once it learned of Shumard's conduct.  *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 615-16 (5th Cir. 1999).  However, determining what constitutes "appropriate remedial action will necessarily depend on the particular facts of the case–the severity and persistence of the harassment, and the effectiveness of any initial remedial steps."  *Id.*  "[C]omplete cessation of [the] harassment" is a strong indicator that the employer's remedial actions were effective.  *See Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999).

Here, Longoria did not report Shumard's harassing conduct to her supervisor, Smith, until mid-July 2003.[17]  Although her TCHR complaint asserts Smith took no remedial action upon learning of the allegations, Longoria's deposition reveals that Smith told Longoria Shumard's conduct was "unacceptable," and Longoria concedes Smith appeared "attentive" to her concerns.  Smith contends  he investigated Longoria's complaint and gave Shumard a stern warning that such conduct would not

---

[17] Longoria documented the incidents with Shumard, and it appears Shumard first made a sexually offensive comment on July 15, 2003.

be tolerated at Kelly.  Longoria and Smith both agree that Longoria made no further complaints to Smith about Shumard.  Furthermore, Longoria could recall no further incidents with Shumard after complaining to Smith.

Based on the totality of the circumstances, Kelly's actions through Smith were sufficiently remedial.  Longoria reported only three incidents to Smith (whether women were "hot," asking a co-worker about her date, and an inquiry about penis size).  Only the isolated, comment about penis size is seemingly offensive.  However, Shumard's conduct was neither persistent nor severe.  A verbal warning was adequate and appropriate under the circumstances because Smith handled the complaint in a prompt manner and Shumard's behavior apparently ceased.  Smith was not required to make a follow-up inquiry with Longoria as to whether the harassment abated.  *See Skidmore*, 188 F.3d at 616.[18]  The Court determines, if she was displeased with Smith's and/or Kelly's response, Longoria failed to act reasonably because she waited two months to reiterate her allegations to Verrier.

Nonetheless, Longoria e-mailed Verrier on September 17, 2003 and repeated her

---

[18]After learning of the alleged harassment, the employer in *Skidmore* told the offender, Mitchell, to leave Skidmore alone and moved Skidmore to a new shift.  *Skidmore*, 188 F.3d at 616.  The court held the employer's action was "reasonably calculated" to relieve the hostile work environment despite the fact the employer did not complete an investigation, issue a reprimand, or make a follow-up inquiry with Skidmore as to whether the harassment had ceased.  *Id.*

July allegations.   Verrier immediately phoned Longoria and promised a swift investigation would commence.  On September 26, 2003, Kelly issued a Shumard a "Performance Improvement" plan[19] and required him to complete sexual harassment training.  Kelly also severed any client accounts that Longoria and Shumard shared.

As was the case with Smith's action in July, Kelly's September response was prompt.  Verrier immediately interviewed Kelly employees about the allegations and issued Shumard a final written warning one day after management met with him. Kelly's response was also effective.  The "Performance Improvement" plan and sexual harassment training clearly outlined Kelly's expectations for Shumard.  As established in *Skidmore*, Kelly was not required to inform Longoria of the remedial action as long as the harassment ceased.  Given the totality of the circumstances, Kelly undisputably exercised reasonable care and acted promptly to correct any alleged sexual harassment.

Thus, Longoria's sexual harassment claim fails for two reasons.  First, Longoria fails to establish the harassment affected a term, condition, or privilege of her employment at Kelly as it was not sufficiently severe or pervasive.  Second, Longoria cannot prove Kelly failed to take prompt remedial action once it learned of the harassment.   Therefore, the Court finds no genuine issue of material fact exists regarding Longoria's sexual harassment claim.

---

[19]The "Performance Improvement" plan was Shumard's final written warning.

16

B.    _Retaliation_

Longoria next claims Kelly retaliated against her for lodging complaints about Shumard's inappropriate conduct.  To make out a _prima facie_ case of retaliation, Longoria must establish:  (1) she engaged in an activity protected under Title VII; (2) she was thereafter subjected to an adverse employment action, and (3) the adverse employment action was taken in response to her protected conduct.[20]  _Shirley v. Chrysler First, Inc._, 970 F.2d 39, 42 (5th Cir. 1992).  Reporting sexual harassment in the workplace is a protected activity under Title VII.  _Hockman v. Westward Communications, LLC_, 407 F.3d 317, 330 (5th Cir. 2004); _see also_ 42 U.S.C. § 2000-3(a) (2000).

Here, Longoria has satisfied the first prong of her _prima facie_ retaliation claim. With respect to the second element, Longoria must present evidence demonstrating that Kelly subjected her to an adverse employment action.  Adverse employment action is restricted to "ultimate employment decisions."  _Hockman_, 407 F.3d at 330  (citing _Walker v. Thompson_, 214 F.3d 615, 629 (5th Cir. 2000)).  Examples of "ultimate employment decisions" involve "hiring, granting leave, discharging, promoting, and

---

[20]Because the TCHRA is based upon federal law with the purpose of executing the policies set forth in Title VII of the Civil Rights Act of 1964, federal case law may be cited as authority in cases relating to the [TCHRA].  _Hoffmann-La Roche Inc. v. Zeltwanger_, 144 S.W.3d 438, 441 (Tex. 2004).

compensating." *Id*. (internal citations omitted).  However, "clarifying job duties" does not constitute adverse employment action.  *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 657-58 (5th Cir. 2002).  Likewise, lowered performance ratings are not adverse employment decisions either.  *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 373 n.11 (5th Cir. 1998).  In the instant case, Longoria's retaliation claim is premised upon the October 1, 2003 meeting with Clark, Smith, and Verrier.  In her TCHR complaint, Longoria asserts Kelly "cited [her] for unacceptable job performance" because she complained about Shumard's conduct.  However, Longoria conceded in her deposition that she was not suspended or demoted during this meeting.  Furthermore, Kelly neither reduced Longoria's salary nor the hours she worked, and Kelly never issued Longoria a written warning.  Consequently, the meeting between Kelly management and Longoria appears to be a standard employee performance evaluation.  Following the October 1 meeting, Longoria's job performance and productivity soared, and Kelly named her the top large branch recruiter for two consecutive quarters.  Hence, Longoria fails to satisfy the second prong of the retaliation claim because she provides no evidence that Kelly took an adverse employment action against her.  Absence of an adverse employment action is fatal to Longoria's *prima facie* retaliation claim.  Therefore, the Court enters summary judgment for Kelly on this issue.

II.     Longoria's Common Law Claims

Under Texas tort law, Longoria contends that:  (1) Kelly intentionally or recklessly inflicted emotional distress upon her, and (2) Kelly negligently hired, retained, or supervised Shumard who subjected Longoria to harassment.

A.     *Intentional Infliction of Emotional Distress ("IIED")*

Longoria maintains Kelly is liable for IIED because: (1) Kelly required Longoria to work with a "supervisor"[21] who subjected her to "outrageous and offensive" sexual harassment; (2) Kelly "intentionally subjected" Longoria to abusive working conditions where she was targeted by sexual harassment; (3) Kelly "intentionally subjected" Longoria to sexual harassment from "co-workers" after she made "repeated requests"[22] for Kelly to take corrective action; and (4) Kelly "intentionally subjected" Longoria to abusive working conditions by requiring her to work under a "supervisor who uttered maliciously [sic] and belittling statements to her in front of co-workers."

In 2004, the Texas Supreme Court concluded: "[W]hen the gravamen of the plaintiff's complaint is for sexual harassment, the plaintiff must proceed solely under a statutory claim unless there are additional facts, unrelated to sexual harassment, to support an independent tort claim for intentional infliction of emotional distress."

---

[21]As previously established, Shumard was not Longoria's supervisor.

[22]Longoria made two requests for corrective action.

*Zeltwanger*, 144 S.W.3d at 441; *see also Stewart v. Houston Lighting & Power Co.*, 998 F. Supp. 746, 754 n.8 (S.D. Tex. 1998) (explaining that "when a plaintiff alleges a claim for intentional infliction of emotional distress based on the same facts making up her Title VII claim, the former is preempted") (citing *Jackson v. Widnall*, 99 F.3d 710, 716 (5th Cir. 1996); *Rowe v. Sullivan*, 967 F.2d 186, 189 (5th Cir. 1992)). Zeltwanger, like Longoria, filed suit alleging sexual harassment and IIED against her employer, but she submitted  identical facts as grounds for both claims. *Zeltwanger*, 144 S.W.3d at 450.   The court restricted Zeltwanger's recovery to the TCHRA's statutory remedy because the heart of the complaint was rooted in sexual harassment. Simply put, *Zeltwanger* held a plaintiff may not assert the same facts in order to take two bites at the apple. *Id*. at 441.

Here, as in *Zeltwanger*, Longoria's claim for IIED and her TCHRA sexual harassment claim arise from identical factual allegations.  Hence, the gravamen of Longoria's complaint is sexual harassment.  Under Texas law, Longoria is foreclosed from asserting an IIED claim because the TCHRA provides an available statutory remedy.

Nonetheless, even if not statutorily preempted, Longoria's factual allegations do not cross the high threshold to succeed on an IIED claim.  To prevail on a claim of IIED, Longoria must establish: (1) Kelly acted intentionally or recklessly;  (2) Kelly's

conduct was extreme and outrageous; (3) Kelly's actions caused Longoria emotional distress; and (4) Longoria suffered severe emotional distress. *MacArthur v. Univ. of Tex. Health Ctr. at Tyler*, 45 F.3d 890, 898 (5th Cir. 1995) (citing *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)). Conduct is "outrageous" if it is "atrocious" and exceeds "all possible bounds of decency," making it intolerable in a civilized community." *See id*. Longoria's IIED claims that stem from Shumard's conduct do not amount to "extreme and outrageous." While Shumard's behavior may be repugnant, it does not rise to the level of atrocity to support a claim for IIED. Futhermore, because Kelly took prompt remedial action after Longoria complained, Longoria can hardly assert Kelly "intentionally or recklessly" subjected her to IIED.

Next, Longoria's affidavit states she experienced emotional distress following the performance evaluation meeting with Clark, Smith, and Verrier on October 1 because their criticism upset her, and she began to cry. In employment scenarios, the courts recognize that in order to "manage its business, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees." *Johnson v. Merrell Dow Pharms., Inc.*, 965 F.2d 31, 34 (5th Cir. 1992). A plaintiff will not succeed on an IIED claim involving "mere 'employment disputes.'" *Id*. at 33. Because the Court already determined this meeting was for a legitimate business purpose, Longoria may not assert an IIED claim based on a "mere employment dispute."

Furthermore, "workplace and employment matters such as 'criticism, lack of recognition, and low evaluations' are not actionable, even if they are unpleasant or unfair." *Zeltwanger*, 144 S.W.3d at 449 (quoting *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 613 (Tex. 1999)).

Last, Longoria contends she suffered "mental anguish" and "emotional distress" as a result of Shumard's inappropriate behavior.  Longoria recounts two specific incidents:  (1) she cried in the bathroom at work, and (2) she cried in front of her family.  To be actionable, emotional distress must be "'so severe that no reasonable [person] could be expected to endure it.'"  *Gearhart v. Eye Care Ctrs. of Am., Inc.*, 888 F. Supp. 814, 823 (S.D. Tex. 1995) (quoting *K.B. v. N.B.*, 811 S.W.2d 634, 640 (Tex.App–San Antonio 1991, writ denied)).  The Court concludes two episodes of crying does not constitute "severe" emotional distress.  *But see Skidmore*, 188 F.3d at 614 (holding a plaintiff who lost weight, experienced anxiety attacks, had headaches and nightmares, and visited a psychiatrist, who testified the plaintiff suffered from post-traumatic stress disorder, was sufficient evidence of severe emotional distress).  Longoria's deposition reveals she did not receive medical or psychological care.  In sum, Longoria failed to produce any evidence that she suffered severe emotional distress.

Based on the foregoing, Longoria's IIED claim is preempted.  Alternatively,

Longoria fails to establish the complained of conduct was "extreme and outrageous" or that she suffered "severe" emotional distress.  Accordingly, summary judgment in favor of Kelly is appropriate.

B.    *Negligent Hiring, Retention, and Supervision*

Last, Longoria asserts Kelly negligently hired, retained, or supervised Shumard. As with the IIED claim, Longoria relies on the same factual allegations as her sexual harassment and retaliation claims.  Longoria's main argument is that Shumard, a co-worker, injured her in the course of her employment at Kelly, and Kelly's response was insufficient.   The Texas Workers' Compensation Act ("TWCA") provides the "exclusive remedy for injuries sustained by an employee in the course of his employment as a result of his employer's negligence."  *Ward v. Bechtel Corp.*, 102 F.3d 199, 203 (5th Cir. 1997) (holding negligence-based claims brought against employer in Title VII suit were barred by exclusive remedy provision of TWCA); *see also Stewart*, 998 F. Supp. at 756 (dismissing plaintiff's claims of general negligence and negligent hiring, retention, and supervision with prejudice because plaintiff failed to establish elements of these claims and offered no reason why negligence claims were not barred by the TWCA); *Campbell v. Jackson Bus. Forms Co.*, 841 F. Supp. 772, 774-75 (S.D. Miss. 1994) (holding that claims grounded in negligence and arising out of employer-employee relationship are barred).  Here, Longoria's claim is preempted

23

by the TWCA.  Furthermore, Longoria fails to articulate how Kelly's alleged negligent hiring, retention, or supervision of Shumard injured her and  provides no evidence that she sought or received medical or psychological help.  Therefore, the Court grants summary judgment in favor of Kelly.  Accordingly, the Court hereby

ORDERS that Kelly Services, Inc.'s Motion for Summary Judgment (Document No. 22) is granted.

SIGNED at Houston, Texas, on this 4th day of August, 2005.

_____

DAVID HITTNER

United States District Judge